2006 VT 68

**William E. and Laura J. Ehrhart v. Agency of Transportation**

**The Christmas Loft, Inc. v. Agency of Transportation**

**Kurt V. Reichelt and Laura M. Reichelt, Trustees of The Kurt V. Reichelt Revocable Trust v. Agency of Transportation**

**Stephen B. Metz and Shelburne Veterinary Hospital, Inc. v. Agency of Transportation**

**Douglas W. Hoar, Cheryl A. Hoar and Goss Dodge, Inc. v. Agency of Transportation**

[904 A.2d 1200]

Nos. 05-243, 05-244, 05-262, 05-263 & 05-306

Present: **Reiber, C.J., Johnson, Skoglund and Burgess, JJ., and Wesley, Supr. J.,** Specially Assigned

Opinion Filed July 14, 2006

*Thomas Z. Carlson* and *Clara F. Gimenez* of *Langrock Sperry & Wool, LLP*, Burlington, for Plaintiffs-Appellants (05-243/244).

*Liam L. Murphy* and *Pamela A. Moreau* of *Murphy Sullivan Kronk*, Burlington, for Plaintiffs-Appellants (05-262/263).

*Robert C. Roesler* of *Roesler, Whittlesey, Meekins & Amidon*, and *Thomas Z. Carlson* and *Clara F. Gimenez* of *Langrock Sperry & Wool, LLP*, Burlington, for Plaintiffs-Appellants (05-306).

*William H. Sorrell*, Attorney General, and *Judith L. Dillon, Trevor R. Lewis*, and *Thomas A. McCormick*, Assistant Attorneys General, Montpelier, for Defendants-Appellees (05-243/244/262/263).

*William H. Sorrell*, Attorney General, and *Judith L. Dillon*, Assistant Attorney General, Montpelier, for Defendant-Appellee (05-306).

¶ 1. **Johnson, J.** These appeals arise from a project to reconstruct a portion of U.S. Route 7 in Shelburne and South Burlington. Four of the five appeals were consolidated for argument, and we have consolidated all five for decision because they share questions of law and fact. Landowners appeal from superior court rulings that the State of Vermont does not owe compensation for decreased traffic flow resulting from a median strip constructed as part of the highway project. We affirm.

¶ 2. Landowners William and Laura Ehrhart, The Christmas Loft, Inc., The Kurt V. Reichelt Revocable Trust, and Stephen Metz and the Shelburne Veterinary Hospital, Inc., own property and operate businesses on the eastern side of Route 7. Landowners Douglas and Cheryl Hoar and Goss Dodge, Inc. own property on the western side of Route 7. The highway project, as it affects these appeals, widened Route 7 from two to four lanes along a stretch of road just over three miles long. In connection with the widening of the road, the State, through the Agency of Transportation, acquired by eminent domain a portion of each landowner's property immediately adjacent to Route 7.

¶ 3. The project also included the placement of a raised median strip along Route 7. Prior to the placement of the median, both northbound and southbound traffic could turn left at essentially any point to reach businesses on the opposite sides of the road. With the median in place, left turns can be made only at sixteen specific "breaks" in the median. To reach a business on the eastern side of the road, southbound drivers must drive past the business, turn around, and access it from the northbound lanes. Northbound traffic can reach businesses on the western side of the road in a similar fashion. Southbound access to the western side and northbound access to the eastern side are unaffected.

¶ 4. Pursuant to 19 V.S.A. § 507, the Agency received an order of necessity for the highway project, which we affirmed. *In re South Burlington-Shelburne Highway Project*, 174 Vt. 604, 817 A.2d 49 (2002) (mem.). The Transportation Board then awarded landowners

compensation for the property adjacent to Route 7 that was taken to allow widening of the road. Landowners Ehrhart, Reichelt, Christmas Tree Loft, and Metz filed separate appeals of their compensation awards with the superior court pursuant to 19 V.S.A. § 513. The Ehrharts filed a motion in limine seeking admission of evidence that the median strip had reduced access to their property, resulting in loss of business. The Agency opposed the motion and moved for partial summary judgment. The court denied the Ehrharts' motion and granted partial summary judgment to the Agency. Based on the denial of their motion in limine, the Ehrharts moved for entry of final judgment, which the court granted. The other three landowners stipulated to an entry of judgment based on the decision in the Ehrharts' case, and the four appeals were consolidated for our review.

¶ 5. The appeal concerning the Hoars and Goss Dodge contains additional issues and has been treated separately until this point. Landowners in that case, who own an automobile sales business on the western side of Route 7, also received compensation for only the loss of property taken by eminent domain in connection with the widening of the road, and also appealed based on the loss of access resulting from the median. In their case, however, the Agency agreed to pay for the construction of a new driveway corresponding to one of the breaks in the median, allowing direct access to the property by northbound traffic. The Hoars agree that thanks to the new driveway, the flow of traffic to their business has not been affected by the median strip. Instead, they contend that the construction of the new driveway resulted in the loss of prime spots for displaying automobiles to attract new business. Thus, they argue that the driveway only mitigated the loss resulting from the median strip, without compensating them fully. The Transportation Board refused to compensate them for any business loss resulting from the median strip, and they appealed to the superior court. The court granted partial judgment to the Agency, relying primarily on the decision in the Ehrharts' case. The parties stipulated to an entry of final judgment, and the Hoars appealed to this Court. We chose not to consolidate their appeal with the other four appeals for briefing or argument because of its different factual context, but the issues of law shared by all five appeals are similar enough to allow them to be consolidated for decision.

¶ 6. Landowners do not challenge their compensation awards for the physical taking of their property adjacent to the existing highway. Instead, they contend that in addition to compensation for those losses,

19 V.S.A. § 501(2) entitles them to compensation for the loss of business resulting from the placement of the median strip. Landowners are correct that the statute requires compensation not only for the value of the land taken through eminent domain, but also for any business loss to the remaining property resulting from the taking. See *In re 89-2 Realty*, 152 Vt. 426, 429, 566 A.2d 979, 980 (1989) ("Compensation for business losses is statutory in Vermont, one of the few states to recognize loss to the individual over and above the value of the land."). We agree with the Agency, however, that landowners cannot be compensated for the loss of traffic flow that results from the placement of a traffic control device, such as a median strip. This reasoning applies not only to the four consolidated appeals, but also to the Hoars' related argument that they should be compensated for the indirect effects of the median strip on their display spaces. We thus affirm the superior court's entry of judgment with respect to all five claims.

¶ 7. Just compensation for takings that result from highway construction is governed by 19 V.S.A. § 501, which provides, in relevant part:

> Damages resulting from the taking or use of property under the provisions of this chapter shall be the value for the most reasonable use of the property or right in the property, and of the business on the property, and *the direct and proximate decrease* in the value of the remaining property or right in the property and the business on the property.

19 V.S.A. § 501(2) (emphasis added). Although business losses are compensable, Vermont's statutory scheme significantly limits their recovery by compensating for only those losses directly and proximately caused by the physical loss of property. For this reason, in *Fiske v. State Highway Board*, 124 Vt. 87, 92, 197 A.2d 790, 793 (1964), we allowed the owner of a tourist cabin business to recover business losses that resulted when the State took part of the frontage of the property to construct a cloverleaf, as "the restriction in frontage ... rendered the cabins substantially less accessible and unsatisfactory as a commercial operation." See also *Gibson Estate v. State Highway Bd.*, 128 Vt. 47, 54, 258 A.2d 810, 814 (1969) (allowing consideration of reduced access when the State's physical taking of land forced the relocation of a sawmill to a less accessible location).

¶ 8. In contrast, we have not allowed compensation for losses that occur when traffic is only routed away from a business, as the

owner of a business does not have a property right in the flow of traffic to the business. See *Howe v. State Highway Bd.*, 123 Vt. 278, 283, 187 A.2d 342, 345 (1963) ("Benefits attached to the currents of public travel are not vested rights and so diversion of traffic does not furnish a ground for compensation."); see also *Spear v. State Highway Bd.*, 122 Vt. 406, 408, 175 A.2d 511, 513 (1961) (stating that when a highway relocation project has resulted in the loss of business, "the legislature has never attempted to provide compensation. . . . Our statute relates business loss to property taken, not to highway relocation."). This is true even when the rerouting may require the taking of a portion of the business owner's property at the same time. See *Sand Bar Corp. v. Vt. State Transp. Bd.*, 145 Vt. 362, 363-64, 488 A.2d 442, 442-43 (1985) (denying compensation for business loss resulting from highway project despite the State's taking of a portion of land behind the property owner's business); *Spear*, 122 Vt. at 408, 175 A.2d at 513 (denying compensation for business loss resulting from relocation of highway despite the taking of a piece of land across the road from the property owner's business). The rule established by *Sand Bar*, *Spear*, *Fiske*, and *Gibson Estate* is clear: when the loss of a piece of property results directly in further losses to a business, the owner is entitled to compensation, but when the business loss arises from the rerouting of traffic, and not from the loss of the land itself, no compensation is due.

¶ 9. Landowners concede that they base their business losses on the change in the flow of traffic from the construction of the median strip. Like the property owners in *Sand Bar* and *Spear*, they contend that because the median strip was part of the same project that resulted in the taking of portions of their land, they are entitled to compensation for the effects of the highway project as a whole. They rely on several out-of-state cases, including a closely analogous case from South Carolina, to argue that when a project results in a taking, the owner of the land that has been taken is entitled to compensation for all incidental effects of the project on the value of the remaining land. *S.C. State Highway Dep't v. Wilson*, 175 S.E.2d 391, 396 (S.C. 1970) (holding that a landowner could recover for placement of a median strip that could not have occurred but for the taking of the landowner's property because "the inquiry is, how much has the particular public improvement decreased the fair market value of the property, taking into consideration the use for which the land was taken and all the reasonably probable effects of its devotion to that use") (quotations omitted); see also *State ex rel. Mo. Highway & Transp. Comm'n v. Jim Lynch*

*Toyota, Inc.*, 830 S.W.2d 481, 485 (Mo. Ct. App. 1992) (holding that loss of access resulting from a median strip constructed as part of a highway widening project was a proper consideration because "[a]ny factor that has a present, quantifiable effect on the market value of the property is proper as an element of damages") (quotations omitted).

¶ 10. We conclude that the fact that the highway project required the taking of landowners' property does not make all losses resulting from the project, including losses resulting from the placement of the median strip, compensable. We note that the rule established by *Wilson* and the other out-of-state cases cited by landowners represents the view of a minority of jurisdictions; the more established principle is that property owners can recover for only those losses that result directly from the taking of the owners' land. See, e.g., *Div. of Admin., State Dep't of Transp. v. Capital Plaza, Inc.*, 397 So. 2d 682, 683 (Fla. 1981) (holding that a landowner who lost a strip of property to a highway widening project could not recover losses caused by concurrent placement of a median strip because "[w]hen less than the entire property is taken, compensation for damage to the remainder can be awarded only if such damage is caused by the taking," and "[c]onstruction of the median, not the taking, caused the alleged damage."); *Painter v. Dep't of Roads*, 131 N.W.2d 587, 590-91 (Neb. 1964) (holding that a landowner whose property was taken in a highway widening project could recover only for the lost land, and not for losses caused by traffic islands constructed as part of the same project); accord *State v. Ensley*, 164 N.E.2d 342, 349 (Ind. 1960); *Jacobson v. State ex rel. State Highway Comm'n*, 244 A.2d 419, 421-22 (Me. 1968).

¶ 11. More importantly, the majority rule is a better expression of the principles embodied in our precedents and the just compensation regime of § 501(2). According to *Wilson*, for instance, South Carolina's just compensation system entitles property owners to any loss that can be related even incidentally to a concurrent taking, instead of limiting compensation to the direct and proximate losses resulting from a taking. See 175 S.E.2d at 396 (stating that without the overall highway project at issue, "there would have been no median and, of course, no damage to the abutting landowner. It logically follows . . . that any damage attributable to the planned median is an incidental result of the exercise of the power of eminent domain . . . ."). Similarly, Missouri's common-law rule, as expressed in *Jim Lynch Toyota*, states that "[w]hen part of a tract of land is condemned, the appropriate measure of damage is the difference between the fair market value of the entire

property before the taking and the fair market value after the taking." 830 S.W.2d at 485 (quotations omitted). It does not limit compensation, as § 501(2) does, to losses resulting directly from the taking.

¶ 12. Landowners finally contend that the losses resulting from the median strip fit within the "direct and proximate decrease" language of § 501(2) because the State could not have built the median strip without widening the road and taking landowners' property. According to this logic, the physical taking of their land caused the placement of the median strip and the resulting business losses. This is an inaccurate description of the chain of causation in this case. Even if the highway project and the median strip could not have been completed without taking landowners' property, it would be the highway project that caused the taking, not the other way around. The restriction in the flow of traffic to landowners' businesses and the widening of the road that resulted in the taking of landowners' property are two incidental effects of the same cause: the highway project. There is no chain of direct and proximate causation connecting the taking of landowners' property and the loss of business resulting from the median strip. Landowners have been compensated for the value of the land that was taken, which is the only direct effect traceable to the taking.

¶ 13. While we recognize the importance of fully compensating property owners for losses resulting from takings, the approach landowners seek would go beyond full compensation. If we did not give effect to the "direct and proximate decrease" language contained in § 501(2), there would be no principled basis for limiting landowners' compensation to the value of their actual property interests. Landowners' approach would result in compensation not only for lost traffic flow, but also for the even more remote effects of the highway project, such as heavier competition from nearby businesses that might be *more* accessible after the completion of the project. Beyond the impracticability of such a system, it would essentially grant every business owner a vested right to the flow of profits that existed at the time of the taking, regardless of whether the predicted loss in business could be traced to the land that was taken.

¶ 14. Attaching legal significance to the incidental link between the physical takings and the losses from the median strip would also introduce an arbitrary distinction between those adjacent landowners whose property is taken and those whose property is left intact. If the State were to take all the land it needed to widen a road from the landowners on one side of the road, and none from the other, it would

be required to compensate half of the landowners affected by the concurrent placement of a median strip, while the other half, who would presumably be affected in equal measure by the median strip, would receive no compensation. Instead of reducing the burden of the highway project on those who may be harmed by it, this approach would place a larger burden than the current system on a smaller group of property owners, while disproportionately benefitting a similarly situated group.

¶ 15. The State's regulation of traffic through its police power, whether it entails the rerouting of a highway or the installation of a median strip, has at least some effect on everyone who uses the highway. The public as a whole benefits from the safety and efficiency gains that result from effective traffic regulation, and the public as a whole is burdened when regulation restricts the flow of traffic. See *Dale Props., LLC v. State*, 638 N.W.2d 763, 766 (Minn. 2002) (noting that the placement of median strips is "an exercise of police power in furtherance of the state's duty to ensure public safety on the roadways," and pointing out that "the restrictions on travel that result from the use of highway medians affect all members of the traveling public and are not unique to abutting property owners"). Compensating abutting property owners under circumstances such as these would require the State to consider the indirect effects of highway improvements on certain members of the public and not others, and it might ultimately make most highway projects impracticable. See *Spear*, 122 Vt. at 408, 175 A.2d at 513 (speculating that if property owners were entitled to compensation for loss of traffic flow, "[w]hole communities might be seeking damage").

¶ 16. We thus conclude that, in each case, the superior court was correct to rule that landowners are not entitled to compensation for losses other than those that flow directly from the taking of the strip of property adjacent to the highway. This eliminates any additional questions arising from the Hoars' case. The Hoars argue that the driveway the State built for them does not compensate fully for the business losses they suffered from the median strip. As landowners are not entitled to any compensation for those business losses, no question remains as to whether the driveway compensates the Hoars fully. Thus, we affirm the superior court's ruling in each appeal.

*Affirmed.*